E-FILED
Friday, 07 September, 2007  09:52:21 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CHAD EVANS,

        Plaintiff,

    v.                                        05-CV-3117

GREG FIRKUS et al.

        Defendants.

## Order

This case proceeds on the following claims:

1)     The conditions in lock-down during July, 2003, in Logan Correctional Center violated the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment and his right to equal protection under the Fourteenth Amendment.

2)     The plaintiff's placement in a segregation cell where he had to sleep on a wet floor, when other dry segregation cells with beds were unoccupied, violated the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

3)     The plaintiff suffered and/or continues to suffer deliberate indifference to his serious medical needs.

4)     The plaintiff was retaliated against for exercising his First Amendment right to file grievances or lawsuits.

5)     The defendants took adverse action against the plaintiff in order to chill his First Amendment right to file grievances/lawsuits.

6)     The defendants violated the plaintiff's procedural due process rights in disciplinary proceedings.

(d/e 15, case management order).

Before the Court are motions for summary judgment filed by the defendants and a motion to compel filed by the plaintiff.

### Motion for Summary Judgment by Dr. Irshad (d/e 118)
(Medical Treatment at Logan Correctional Center for Hernia, Cyst, and Lipoma)

*I. Undisputed Facts[1]*

1. Chad Evans was incarcerated at the time he filed his lawsuit. He is currently incarcerated in Robinson Correctional Center.

2. This lawsuit concerns events that occurred during his incarceration in Logan Correctional Center from June 2002 to February 2005.

3. Dr. Irshad is a physician licensed to practice medicine in the State of Illinois. (Dr. Irshad Aff.)

4. In the course of his practice as a physician, Dr. Irshad served as the Medical Director at Logan Correctional Center from February 2003 to October 2004. (Dr. Irshad Aff.)   In the course of his practice as a physician at Logan, Dr. Irshad saw Plaintiff.  (Dr. Irshad Aff.)

5. Plaintiff's claims against Dr. Irshad regard Plaintiff's hernia, a ganglion on Plaintiff's wrist, and a lipoma on Plaintiff's back. (Plaintiff's Deposition, p. 4-5).  Plaintiff withdrew his claim regarding his broken nose.  (d/e 127, ¶5).

6. Mr. Evans' hernia developed when he was working out, lifting weights, at Galesburg prison, the date is unclear.  (Plaintiff's Deposition, p. 9; Complaint p. 14).  He went to the doctor at Galesburg but nothing was done.  (Complaint p. 14).  He was transferred to Dixon at an unspecified date and given a truss to wear.  *Id.*  He was then transferred to Pontiac where the truss was confiscated.  He then transferred to Sheridan where again he received no truss or medical treatment for his hernia.  *Id.*  Mr. Evans still has the hernia, which is located in his lower abdomen. (Plaintiff's Deposition, p. 5.).

7. The hernia is reducible.  Plaintiff testified in his deposition that the hernia is now about 50% bigger (about the size of a racquetball) and that it comes out about twice a week, when he has to push in back in.  At Logan, the hernia was smaller than a racquetball but bigger than a golf ball.  At his deposition in January 2007, the hernia was not "out" and therefore was "barely" visible.  (Plaintiff's Dep. P. 6).  He testified that the hernia had come out more while he was at Logan.  *Id.*

8. Plaintiff testified that his day does not involve much physical activity because his hernia does not allow it. (Plaintiff's Deposition, p. 31; d/e 127 ¶ 17).  He is able to take classes, go to meals, and participate in other non-physical activities. (Plaintiff's Deposition, pp. 32.33.)

---

[1] Many of these facts are adopted verbatim from Dr. Irshad's proposed facts, to the extent not disputed.

3:05-cv-03117-HAB-BGC   # 133   Page 3 of 17

He does not exercise or play sports because of the hernia. When the hernia is out he has problems going to the bathroom. *Id.* at 8-9. At the time of his deposition (January 5, 2007), Plaintiff was incarcerated in Big Muddy Correctional Center. He had not seen anyone at Big Muddy about his hernia. (Plaintiff's Dep. p. 14).

9. Plaintiff has a ganglion cyst on his right wrist. A ganglion cyst is a gelatinous fluid-filled sac under the skin commonly found at the wrist joint, but may be found on other locations. The cyst may resolve on its own as the fluid levels rise and decrease in the cyst.

10. Plaintiff asserts that his right wrist hurts more when used, and he uses the wrist frequently for doing homework and writing letters. Plaintiff is able to reduce the size of the cyst by flexing his wrist and slamming it up against a wall or something which allows the fluid to come out of it. (Plaintiff's Deposition, pp. 18-19.)

11. Mr. Evans also had a "lipoma" on his back which has since been removed. (Plaintiff's Deposition, pp. 20-21.) A lipoma is a pocket of fatty tissue. The lipoma had been present on the Plaintiff's back since sometime in 2000 or 2001. (Plaintiff's Deposition, p. 22.) The lipoma grew in size over the course of time. (Plaintiff's Deposition, p. 22.)

12. Plaintiff had difficulty sleeping with the lipoma because of its location on his back. He could sleep on his stomach, but would still have trouble due to movement during sleep. (d/e 127 ¶ 14). He also had difficulty bending and sitting in a chair with a back because doing so put pressure on the lipoma, digging into his spine. Plaintiff testified that the lipoma was painful when touched. (Plaintiff's Deposition, p. 24.)

13. Plaintiff believes the lipoma was approximately the size of a golf ball at the time he saw Dr. Irshad. (Plaintiff's Deposition, p. 24.).

14. In February 2000, at Dixon Correctional Center, Plaintiff was issued a truss for his hernia. The truss was apparently not allowed to transfer with him out of Dixon. Plaintiff asserts that the truss helped prevent the hernia from popping out, which enabled him to engage in regular work and exercise. (Plaintiff's Dep. p. 10). Attached to the Complaint are affidavits from other inmates who witnessed Plaintiff attempt to exercise or play softball but had to stop, holding the hernia area in apparent pain.

15. On June 28, 2002, Plaintiff was seen at Logan. Plaintiff complained of pain to his right testicle that he thought might be attributable to his hernia or perhaps cancer. The doctor ordered a sonogram which was performed in October 2002. The sonogram indicated no masses, but did indicate possible "subclinical right epididymitis."

16. The first time Dr. Irshad personally saw Plaintiff was February 4, 2003. (Dr. Irshad Aff-B.) Dr. Irshad's note of that date reads as follows:

S (subjective): Erythema with itching and scaly lesion on and around the eyelids

3

and nose some three months. Has tried already local steroid.
O (objective): Blood pressure 122/80.
Ganglion cyst or lipoma on right wrist
Lipoma on back
Chronic low back pain with right leg radiculopathy
History of back sprain disc syndrome.
A (assessment): Lipoma, ganglion cyst, disc syndrome. Lupus
P (plan): Discontinue HCT (diuretic or water pill for the plaintiff's previously
diagnosed high blood pressure)
Naproxen 500 mg BID (twice a day) for 30 days
Check BP (blood pressure) once a week for 4 weeks
Return to call in one month (Dr. Irshad Aff-B.)

17. Pursuant to his examination of Mr. Evans, Dr. Irshad documented Mr. Plaintiffs'
complaints of itchiness around his eyelids and nose. Dr. Irshad prescribed Naproxen to address
the itching and scaly lesions. He noted the patient had a ganglion cyst or lipoma on his right wrist,
as well as one on his back. The Naproxen prescribed could also serve to address the back pain of
which Plaintiff complained. Dr. Irshad scheduled Plaintiff to be seen in one (1) month for
reevaluation. He discontinued the HCT (diuretic) as he no longer found it to be necessary for
Plaintiff.  According to Dr. Irshad's affidavit, Mr. Evans did not appear to be in distress. (Dr.
Irshad Aff.)

18.  Plaintiff asserts that he told Dr. Irshad about his hernia during the February 4, 2003
visit.  Plaintiff asserts he told Dr. Irshad of pain using the restroom and having to push on his
hernia area to reduce the hernia.  Plaintiff says he asked Dr. Irshad for a truss like the one he had
been issued in Dixon.  Plaintiff says Dr. Irshad did not examine the hernia or look at Plaintiff's
sonogram results.  Instead, Dr. Irshad only responded that Plaintiff could not have surgery or a
truss.  (d/e 127, Ex. 2, ¶ 9-13).   Dr. Irshad also reportedly only "poked" at the lipoma on
Plaintiff's back, saying there was nothing he could do.  *Id.* ¶¶ 17-18.

19. Dr. Irshad next saw Mr. Evans on March 4, 2003 for his follow-up visit as previously
indicated.  At that time, Dr. Irshad examined Mr. Evans. His note states as follows:

S (subjective): Off HCT (diuretic) BP (blood pressure) - normal
Naproxen not tolerated.
Still has pain.
Chronic back pain since 3 months
O (objective): BP (blood pressure) 126/82
Lungs clear
Heart NSR (normal sinus rhythm)
Periorbital edema due to seasonal allergies
A (assessment): Hypertension
On no medication
Blood pressure - normal

4

NSAIDS (non-steroidal anti-inflammatory drugs) - not tolerated
Seasonal allergies
P (plan): D/C (discontinue) Naproxen.
No further treatment (Exhibit 1-C.)

20. In Dr. Irshad's opinion, Plaintiff had previously been diagnosed with hypertension.
Pursuant to Dr. Irshad's examination, Plaintiff's hypertension was under control to the point that
he no longer needed medication for that condition. Mr. Evans reported that the Naproxen he was
taking for his prior complaints, was not agreeable with him.  Dr. Irshad therefore discontinued the
medication and ordered no new medication as none was medically indicated nor desired by the
patient. The chronic back pain of which Mr. Evans complained did not appear to be related to the
lipoma as a lump of fatty tissue is not something that would cause back pain. Accordingly, there
was no treatment indicated at the time in Dr. Irshad's opinion.  (Dr. Irshad Aff.)

21.  Plaintiff asserts that he brought up all the same complaints on March 4, 2003 (hernia,
back lipoma, wrist ganglion), but that Dr. Irshad again told him nothing would be done and that
the hernia "would not kill" Plaintiff.  (d/e 127 ¶ 19).  Plaintiff avers that he told Dr. Irshad he
wanted the lipoma and ganglion removed, as had been done at Dixon for a cyst above Plaintiff's
eyebrow.  According to Plaintiff, Dr. Irshad then slammed a book on Plaintiff's wrist, in an
attempt to burst the ganglion.  (d/e 127 ¶ 22; Plaintiff's Dep. p. 15).  The ganglion did appear to
reduce somewhat.  *Id.*

22. Dr. Irshad next saw Mr. Evans on June 13, 2003. On that date, his note reads as
follows:

S (subjective): a cyst on right wrist - since 7 months
O (objective): ganglion cyst right hand
A (assessment): aspiration and steroid injection locally
Abv H/O (history of) chronic low back. Exercise. Hot steam bath.
P (plan): aspiration of ganglion cyst next Thursday. (Exhibit 1-D.)

23. In Dr. Irshad's opinion, Mr. Evans suffered from a ganglion cyst on his right wrist.
Dr. Irshad recommended that the fluid in the cyst be aspirated in order to alleviate any discomfort
the
cyst may cause to Mr. Evans. (Exhibit 1-D.)

24. Dr. Irshad next saw Mr. Evans on June 19, 2003.  Dr. Irshad's note from that date
reads as follows:

S (subjective): ganglion cyst right hand on wrist
O (objective): No change in ganglion cyst.
A (assessment): Under local analgesic 1% lidocaine injected and aspiration done
with 18 gauge needle. Gelatinous material aspirated about 7 to 8 cc's. Then
pressure dressing was applied. Procedure was tolerated well.

P (plan): Ace bandage wrap X 2 with moderate pressure.
F/U PRN (follow up as needed). (Exhibit 1-E.)

25. On June 19, 2003, Dr. Irshad aspirated Mr. Evans' ganglion cyst in an effort to alleviate any discomfort he may have in his right wrist that was being caused by the ganglion cyst. The aspiration was successful as a significant amount of fluid was aspirated. In Dr. Irshad's opinion, this was the appropriate form of treatment for Mr. Evans at that time. This care and treatment was provided in an effort to improve Mr. Evans' comfort level. (Exhibit 1.)

26. Plaintiff avers that he asked again for a truss from Dr. Irshad on June 19, 2003, reporting that he was unable to exercise without a truss due to his hernia, and that exercise was important to control Plaintiff's hypertension. Plaintiff asserts Dr. Irshad again refused the truss. (d/e 127, Ex. 2 ¶29).

27. Dr. Irshad next saw Mr. Evans on August 25, 2003. His note from that date reads as follows:

S (subjective): Right inguinal hernia and lymph gland in groin.
O (objective): No obstruction or incarceration noted. Minimally enlarged few inguinal lymph node.
A (assessment): No active problem needing intervention.
P (plan): F.U. PRN (follow up as needed). (Exhibit 1-F.)

28. On August 25, 2003, Mr. Chad Evans complained again about the hernia. On examination, Dr. Irshad determined the hernia was present, but found no obstruction or incarceration. The hernia was minimally enlarged. In Dr. Irshad's opinion, the hernia did not present a serious medical need or substantial risk of harm and no treatment was medically necessary at that time. In Dr. Irshad's opinion, the hernia was reducible and could be followed conservatively. (Dr. Irshad Aff.).

29. Plaintiff avers that when he saw Dr. Irshad on August 25, 2003, he recounted prior incidents of strangulation, including an incident during the night at Logan in which Plaintiff "awoke sweating, severe abdominal pain, testicle pain, feeling as if I was going to throw up, and my hernia hard and large." (d/e 127 ¶ 34). After pressing a long time, Plaintiff was finally able to reduce his hernia. Plaintiff also avers that he told Dr. Irshad about testicle and abdominal pain, pain using the bathroom, his belief that the hernia had grown, and his belief that a truss would help, as it had helped before. Plaintiff asserts that Dr. Irshad responded that nothing could be done, as the hernia was no longer strangulated. (d/e 127 ¶ 39).

30. Plaintiff wrote to Dr. Elyea on August 29, 2007, telling him about his conditions and his need for treatment. Defendant Huffman, the health care administrator, told Plaintiff he could not interfere with Dr. Irshad's treatment decisions. At this point, Plaintiff realized he would not be receiving any help so he did not bring up his problems again with Dr. Irshad.

6

31.  On November 3, 2003, Mr. Evans appears to have reported the return of his ganglion cyst to the nurse practitioner. The nurse practitioner consulted with Dr. Irshad about aspirating the ganglion cyst once again. Dr. Irshad approved the aspiration by the nurse practitioner. This was scheduled to take place on November 20, 2003. (Exhibit 1-J.)  With respect to the ganglion cysts, Mr. Evans signed consent forms for aspirations on June 19, 2003 and November 20, 2003. (Exhibits 1-M and 1-N.).  When the fluid is removed, the ganglion becomes more or less flat. (Plaintiff's Deposition, p. 20.)  When the cyst is flat, the wrist is more comfortable for Mr. Evans. (Plaintiff's Deposition, p. 20.)

32.  Mr. Evans made similar requests to see the nurse practitioner regarding his ganglion cyst on March 31, 2004 and April 2, 2004. Dr. Irshad had no objection to the nurse practitioner reducing the ganglion cyst on those dates by aspiration. (Exhibits 1-K and 1-L.)

33. The next time Dr. Irshad saw Mr. Evans personally was on July 29, 2004. On that date, the patient's physical examination was done. Mr. Evans reported suffering from diarrhea on that date. Dr. Irshad treated him with Imodium and Pepto Bismol.  Plaintiff was also referred to the
dentist. (Exhibit 1-G.)

34. The next time Dr. Irshad saw Mr. Evans was on October 1, 2004. His note from that date reflects the following:

S (subjective): Chest pain sharp in the lower sternum. Lasts few seconds. Abv. Experiences shortness of breath.
O (objective): BP (blood pressure) 134/87. No radiation of pain.
Lungs clear
Heart normal sinus rhythm.
Abdomen soft
A (assessment): No associated side feeling.
Lipid normal
Blood pressure normal
Possible GERD (gastric esophageal reflux disease)
History of hiatal hernia
P (plan): Zantac 150 mg twice a day for 30 days
Return in one month. (Exhibit 1-H, pp. 1-2.)

35. On October 1, 2004, Plaintiff did not appear to be in distress and his symptoms were suggestive of possible GERD associated potentially with his hiatal hernia, in Dr. Irshad's opinion. Accordingly, Dr. Irshad prescribed Zantac to address Plaintiff's acid reflux. In Dr. Irshad's opinion, this was the appropriate treatment.  Plaintiff's hiatal hernia is not related to his inguinal hernia. (Dr. Irshad Aff.)

36. Dr. Irshad left the Logan Correctional Center toward the end of 2004. (Plaintiff's Deposition, p. 25.).  Dr. Irshad did not participate in Mr. Evans' care and treatment after October

7

1, 2004. (Dr. Irshad Aff.)

37.  In Dr. Irshad's opinion, Plaintiff's ganglion cyst, lipoma and hernia did not present a serious medical need.  The conditions did not present a substantial risk of serious harm.

38. In Dr. Irshad's assessment, the conditions of which Mr. Evans complained in terms of his inguinal hernia, his ganglion cyst, and his lipoma presented no more than a mild discomfort to him. (Dr. Irshad Aff.)

39.  In Dr. Irshad's opinion, Mr. Evans did not appear to be in any significant pain or distress at any time he presented to Dr. Irshad with complaints involving his hernia, cyst, or lipoma. (Dr. Irshad Aff.)

40.  As to the lipoma and ganglion, patients outside of the Department of Corrections would choose the option of no treatment for these conditions as there is no medical need to have them removed. (Dr. Irshad Aff.)

41. In Dr. Irshad's opinion, a truss was not medically indicated for Mr. Evans' hernia. A truss does not prevent a hernia from bulging and may provide a patient a false sense of security. It is not a long-term form of treatment. (Dr. Irshad Aff.)

42. In Dr. Irshad's opinion, Mr. Evans' ganglion cyst did not require surgery, and therefore surgery was considered elective. (Dr. Irshad Aff.)

43. In Dr. Irshad's opinion, Plaintiff was treated appropriately for his conditions. He was provided with conservative treatment and his conditions were monitored as needed and in response to Plaintiff's complaints. (Dr. Irshad Aff.)

44. In Dr. Irshad's opinion, the removal of Mr. Evans' lipoma would be considered an elective procedure, one that is not medically necessary.  The risks of surgery to remove a lipoma include bleeding, pain, and recurrence of the lipoma. (Dr. Irshad's Aff.)

45.  Dr. Lochard became the Medical Director at the Logan Correctional Center sometime between October 1, 2004 and November 3, 2004. (Dr. Irshad Aff.)

46.  Dr. Lochard saw Plaintiff on December 10, 2004 and scheduled an excision of the lipoma on his back. (Dr. Irshad Aff-I.)  Dr. Lochard noted that the lipoma was about 4 x 4 centimeters over Plaintiff's vertebral column.

47.  Before the lipoma excision could occur, Plaintiff was transferred to a different prison. In April, 2006, a different doctor, Dr. Shepherd, also put Plaintiff in for a surgical consult regarding the lipoma.  Dr. Shepherd then left the health care unit for unknown reasons, and the excision was still not done.  Dr. Larson then took over and put Plaintiff in for surgery to remove the lipoma in September 2006.

48. In September 2006, the lipoma (still about 4x4 cm, according to the medical records) was removed under local anesthesia in an outpatient procedure at a clinic. Plaintiff tolerated the procedure well and he no longer has trouble sleeping, sitting or bending. He now has no back pain or restrictions regarding his back.

## II.    *Analysis*

Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373.

The court does not believe an inference arises that Plaintiff's hernia, ganglion or lipoma were serious medical needs within Eighth Amendment parlance. In Dr. Irshad's opinion, they did not need medical treatment–making the medical treatment Plaintiff sought elective. It is true that other doctors did prescribe a truss for Plaintiff's hernia and excision of the lipoma, but the record does not reveal why. Perhaps those doctors concluded, like Dr. Irshad did for the ganglion, that though the hernia and lipoma were not serious enough to *mandate* treatment, that a truss and excision would increase Plaintiff's comfort.

In any event, even if Plaintiff's hernia, ganglion and/or lipoma were serious medical needs, no inference arises that Dr. Irshad was deliberately indifferent to those needs. "[M]edical malpractice, negligence, or even gross negligence does not equate to deliberate indifference. . . . It is not enough to show, for instance, that a doctor should have known that surgery was necessary; rather the doctor must know that surgery was necessary and then consciously disregard that need in order to be held deliberately indifferent." *Johnson v. Doughty*, 433 F.3d 1001, 1012-13 (7th Cir. 2006)(citations omitted). There is no evidence that surgery was medically necessary for any of Plaintiff's conditions, nor that a truss was necessary for Plaintiff's hernia. That other doctors ordered the lipoma excised or ordered a truss shows at most a difference of professional opinion, not that Dr. Irshad's decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that . . . [Dr. Irshad] did not base the decision on such judgment." *Estate of Cole v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996).

It is true that the failure to treat a chronic, painful condition that significantly restricts daily activities can rise to the level of cruel and unusual punishment. *Gutierrez*, 111 F.3d at 1371 (" . . . delays in treating painful medical conditions that are not life-threatening can support Eighth

Amendment claims), *citing Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)(ignoring request for medical treatment can be cruel and unusual punishment "provided that the illness or injury . . . is sufficiently serious or painful to make the refusal of assistance uncivilized"); *Kelley v. McGinnis*, 899 F.2d 612 (7th Cir. 1990)(inmate can recover "if he can prove that the clinic personnel deliberately gave him a certain kind of treatment knowing that it was ineffective, either as a means of toying with him or as a way of choosing 'the "easier and less efficacious treatment"'")(*quoting Estelle v. Gamble*, 429 U.S. 97, 104 n. 10 (1976)(other citation omitted). Pain is a subjective experience. *See Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)("Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition.").

However, the subjective pain experienced by an inmate does not automatically create an inference of an Eighth Amendment violation. "Not every refusal of medical treatment constituted cruel and unusual punishment. Medical 'need' runs the gamut from a need for an immediate intervention to save the patient's life to the desire for medical treatment of trivial discomforts. . . Where to draw the line between the end points is a question of judgment that does not lend itself to mechanical resolution." *Ralston v. McGovern*, 167 F.3d 1160, 1161-62 (7th Cir. 1999).

Plaintiff's subjective descriptions of pain and difficulties were not at the trivial end of the scale, but the court does not believe an inference arises that they were serious enough to implicate the Eighth Amendment in light of Dr. Irshad's opinions. Further, Dr. Irshad did not ignore Plaintiff's complaints of pain, he only disagreed with the treatment that should be provided in response to those complaints. *See Johnson*, 433 F.3d at 1015 (testimony indicated that "decisions on hernia surgeries are left to the medical professionals who factor the pain and difficulty caused by a hernia into their decision about whether to operate); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)(difference of professional opinion as to seriousness of arthritis and thus on need for soft-soled shoes did not amount to deliberate indifference). In short, the court does not believe a reasonable juror could find that Dr. Irshad was deliberately indifferent to Plaintiff's medical needs.

### Motion for Summary Judgment by IDOC Defendants

### I. Medical Needs: Hernia, Lipoma, Ganglion

Having concluded that Dr. Irshad was not deliberately indifferent to Plaintiff's needs regarding his hernia, lipoma and ganglion, the court must also conclude that the other defendants were not deliberately indifferent to those needs. Whether Plaintiff's conditions presented serious medical needs were not within a layman's grasp. Thus the IDOC defendants were entitled to rely on Dr. Irshad's expertise; he was the treating physician. "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . ." *Greeno v. Daley,* 414 F.3d 645, 656 (7th Cir. 2005). There is no suggestion that Plaintiff's access to Dr. Irshad was curtailed or that Dr. Irshad's orders were not carried out by the IDOC defendants. Accordingly, summary judgment is mandated for all the defendants on this claim.

## II. Dental Needs

The IDOC defendants submit an affidavit that Plaintiff did not file a grievance about his dental treatment at Logan Correctional Center.  (d/e 123, Ex. F).  Plaintiff does not address this in his response, nor does the court find any grievance in the record about dental treatment.  Accordingly, summary judgment will be granted on the Plaintiff's claim regarding his dental needs on the grounds of failure to exhaust.  In any event, Plaintiff does not dispute the defendants' assertion that his dental records show refusal of treatment by defendant Dr. Thompson.  Plaintiff also does not dispute the defendants' assertion that his dental records show he was treated for various dental problems regularly during his incarceration at Logan Correctional Center.  In fact, Plaintiff does not appear to address the dental claim at all.  Accordingly, the court finds that Plaintiff has waived this claim, even if he had evidence of exhaustion.

## III.  January 13, 2005 disciplinary ticket and subsequent disciplinary hearing and punishment

According to Plaintiff, he was assigned to work at "forward stock" at Logan, which came with an unrestricted movement pass granted by Defendant Willis.  Part of Plaintiff's job was moving and installing shelves in inmates' cells, for which he had authorization from Willis and other prison officials.  Despite this authorization, Willis placed Plaintiff and his brother under investigation regarding their movement of certain shelves.  Willis wrote a disciplinary ticket against Plaintiff accusing him of contraband/unauthorized property and unauthorized movement. The ticket accused Plaintiff and his brother of taking four shelves from the warehouse to the forward stock area without authorization.  (d/e 128, Ex. 10).

A disciplinary hearing was held on the ticket on January 17, 2005.  The Final Summary Report states that Plaintiff had requested no witnesses and had admitted the ticket was accurate. (d/e 123, Ex. D).  Plaintiff counters that he admitted nothing and that he did ask for witnesses and exonerating documents.  Plaintiff was found guilty on the ticket and received 11 months C grade, 11 days segregation and 1 month recreation restriction.  His punishment was upheld by the Administrative Review Board.

### A.  Procedural Due Process Claim

Drawing inferences in Plaintiff's favor, he was denied the opportunity to present evidence in his defense that would have exonerated him of all charges.  That is troubling, but the Constitution does not protect against all arbitrary and unfair actions.  *See Leslie v. Doyle*, 125 F.3d at 1136 (*dicta*)("Broadly speaking, the Constitution does not create a cause of action for arbitrary and purposeless acts by officials per se . . . [citations omitted]; it prohibits the abuse of power that effects a significant deprivation."); *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir. 1995)(per curiam).  To make out a procedural due process claim, Plaintiff must first identify a constitutionally-protected liberty interest of which he was deprived.  Plaintiff received one month C grade, 11 days segregation, and one month recreation restriction.  Those punishments are simply not severe enough to implicate constitutionally-protected interests.  Inmates have no

11

constitutionally protected interest in avoiding transfer to a maximum security prison with more burdensome conditions.  *Meachum v. Fano*, 427 U.S. 215, 225 (1976); *see also Thomas v. Ramos*, 130 F.3d 754, 760 (7th Cir. 1997)(prisoner has no liberty interest in remaining in general population or avoiding transfer to another prison).  Inmates have no protected interest in being classified as a certain grade, *Thomas*, 130 F.3d at 762 n. 8., nor in yard privileges, *see Sandin*, 515 U.S. at 484; *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988)(summary judgment affirmed on 8th Amendment claim of denial of only yard time, not all exercise).  Thus, Plaintiff was not constitutionally entitled to any procedural due process before those punishments were imposed on him.  From a procedural due process point of view, the punishments could have been inflicted on Plaintiff with no hearing at all.  Summary judgment will therefore be granted to Defendants on Plaintiffs' procedural due process claim.

### B. Retaliation/Chill Claim

Though Plaintiff has no procedural due process claim, the disciplinary ticket, punishment and transfer may still be the basis for a retaliation claim.  "The federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement, . . . as well as the right to be free from retaliation for exercising this right."  *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996)(citations omitted)(denying qualified immunity for retaliation claim).  Acts which are constitutional can become unconstitutional if done in retaliation for the exercise of a constitutionally protected right.  *See DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 1999)(citations omitted).  "This is so even if the adverse action does not independently violate the Constitution."  The IDOC defendants have not moved for summary judgment on the merits of the retaliation claim.[2]

As to Defendant Willis, the court does see a possible retaliation claim.  According to Plaintiff's deposition, Plaintiff told Willis he would be filing a grievance on the internal investigation of the shelf incident because "it was bogus and Willis knew it."  Willis replied, "Don't make it personal," to which  Plaintiff responded, "I'm not, I just have to file a grievance to exhaust my remedies before filing suit."  Willis then offered not to give Plaintiff's brother across the board punishment if Plaintiff didn't file grievance.  Plaintiff declined and Willis wrote ticket.  According to Plaintiff, Willis then put Plaintiff in segregation and confiscated Plaintiff's legal books and papers, including a complaint Plaintiff had begun drafting about the lockdown. (Plaintiff's Dep. P. 83-85).

All this arguably allows an inference that Willis wrote the ticket in retaliation for Plaintiff's statement to Willis that he intended to file a grievance.  This is sufficient to state a retaliation claim against Willis–the protected conduct being Plaintiff's pursuit of his First Amendment right to seek redress of grievances for the bogus investigation.

---

[2]The defendants do argue they were not personally responsible because all they did was handle the hearings and process grievances.  However, they do not address their motivations and reasons for the adverse actions they took in doing so.

12

However, the Court sees no reasonable inference that any of the other defendants were motivated by retaliation for Plaintiff's exercise of his First Amendment rights.  Plaintiff asserts they all acted in retaliation, but retaliation for what?  Plaintiff does not identify what grievances or lawsuits he had filed before the ticket was heard and the Court sees none in the record.  All the grievances in the record, as well as this lawsuit, occurred after Willis' writing of the ticket and the disciplinary hearing and transfer. It is not enough for defendants to be motivated by dislike for Plaintiff–they must have been motivated by a desire to retaliate against Plaintiff because he was exercising a constitutionally protected right.[3]   "To succeed on a retaliation claim, the plaintiff must "establish that *his protected conduct* was a motivating factor behind [the defendants' actions], . . ."  *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996).  What was the constitutionally protected conduct?

Even if Plaintiff identified the constitutionally protected conduct that motivated the adverse actions by the defendants (other than Willis), he still must prove that the same adverse actions would not have occurred absent the retaliatory motive.  *See Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004).  In other words, if the adverse actions would have been taken anyway, the retaliation claim fails.  There is no evidence on this point either.

The court is concerned that no justiciable question exists regarding the retaliation claim, except as to Defendant Willis.  Part of this court's responsibility is to ensure efficient use of judicial resources, jurors' time and the quality of the trial.  Accordingly, the remaining defendants (except Willis) will be directed to file a summary judgment motion on the retaliation claim.

## IV.  Segregation Cell

Plaintiff was placed in segregation for 11 days as a result of Willis' disciplinary ticket.  According to Plaintiff, the metal "bed" upon which Plaintiff's  mattress should have been placed was broken.  Plaintiff therefore had to put his mattress on the floor, but floor had water on it because the showers in adjacent rooms were leaking.  Plaintiff testified that Defendant Firkus walked by and asked Plaintiff why he was sleeping on the floor.  Plaintiff explained and asked if he could be moved to one of the vacant segregation cells which were dry, empty and had intact

---

[3]Plaintiff testified that Firkus did not like Plaintiff because he thought Plaintiff had too much "juice,"–too much independence. (Plaintiff's Dep. 90-92).  Plaintiff also asserts that officers Shadone and Anderson told Plaintiff he would be transferred because of his lawsuits and in fact was transferred because of his lawsuits, but this is hearsay not admissible under any exception to hearsay.  Firkus was not even the warden when Plaintiff was transferred, nor did Firkus sign off on the Adjustment Committee report.  Plaintiff's speculation that the new warden Bensko was motivated by retaliation in the transfer and in the punishment appears to be speculation unsupported by evidence.  Similarly, the court sees no evidence that Defendants Gonzalez or Benton were motivated by retaliation for Plaintiff's exercise of his First Amendment rights.  All they did was believe Willis' version over Plaintiff's and decline to investigate further.

"beds."  According to Plaintiff, Firkus said no, laughed at Plaintiff, and told the officers that Plaintiff was to receive nothing, that Firkus "hate[d]" him.  (Plaintiff's Dep. p. 2).

Defendants argue that sleeping on a mattress on a wet floor for 11 days is not objectively serious enough to violate Eighth Amendment standards.  "While the Constitution does not require that prisons be comfortable, prison conditions do violate the Constitution where they 'deprive inmates of the minimal civilized measure of life's necessities.'" *Delaney*, 256 F.3d at 683, *citing Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).  The standard is judged against "contemporary standards," evolving with society.  *Id.*

The court believes that the conditions described by Plaintiff, coupled with readily available segregation cells without those conditions and Firkus' purported responses, allows a reasonable inference of an Eighth Amendment violation.  It is true that Plaintiff did not suffer physical injury and therefore cannot recover damages for emotional distress.  42 U.S.C. § 1997e(e).  However, having to sleep on a presumably wet mattress on the floor for 11 days might be viewed as a sufficiently serious deprivation under contemporary standards of decency, given that it was an easy and cost-free problem to fix (drawing inferences in Plaintiff's favor).  Deliberate indifference can be inferred by Firkus' purported refusal to move Plaintiff to a readily available dry segregation cell, purportedly out of spite.  This claim therefore proceeds to trial against Defendant Firkus.

### V. Lockdown

The IDOC defendants also assert that Plaintiff failed to file a grievance about the conditions of confinement he suffered on lockdown in July 2003.  However, Plaintiff avers that he did complete a grievance and filed it the only way possible during lockdown–by placing the grievance in his door for staff to pick up.  He avers that staff did pick his grievance up, but, upon his later inquiry, the grievance could not be found.  By then it was too late to file a grievance about the lockdown.

An inference arguably arises that Plaintiff had no administrative remedies available to him to grieve the lockdown.  The grievance he did file was not responded to and apparently lost.  Dismissal for lack of exhaustion is therefore not appropriate.

Defendants do not address the merits of the Eighth Amendment claim regarding the lockdown in Plaintiff's unit in July 2003.  Plaintiff believes the lockdown was in response to an alleged assault on Defendant Battin's son.  Plaintiff testified in his deposition that there were two lockdowns, essentially back to back.  He testified that, though it was very hot, inmates were not permitted fans, were not permitted adequate access to water in the bathroom to wash themselves or access to water to drink (there were no sinks in the cells), and the cell doors were required to remain closed, preventing air circulation.  (Plaintiff's Dep. pp. 42-46).  The only water/liquid available was provided at chow.  Inmates were served cold cuts every day for lunch, gray with fur, and spoiled juice.  (Plaintiff's Dep. P. 47-48).  Other units on lockdown were served the same meals as the general population–i.e., what was printed on the menu. Plaintiff experienced

14

stomachaches and diarrhea when he tried to eat the cold cuts (Plaintiff's Dep. p. 49, 58).[4]

The court believes a reasonable jurist could conclude these deprivations were sufficiently serious to violate the Eighth Amendment.  A reasonable jurist could also infer deliberate indifference: Plaintiff testified that he asked defendants repeatedly for alleviation of the conditions but that the defendants refused.  Defendants do not address the equal protection claim that other units on lockdown receive the same meals as the general population.  Accordingly, these claims will proceed to trial.

## VI.  Qualified Immunity

Defendants argument on qualified immunity is not developed and therefore not persuasive.  In any event, qualified immunity is not appropriate on the remaining claims, given the factual inferences in Plaintiff's favor set forth  above.

IT IS THEREFORE ORDERED:

1)  The motion for summary judgment by Defendant Dr. Irshad is granted (d/e 118).  Defendant Irshad is dismissed.

2)  The motion for summary judgment by Defendants Firkus, Sims, Bensko, Willis, Schonauer, Niles, Jennings, Battin, Tanner, Huffman, Elyea, Snyder, Gonzalez, Cooper, and Benton (the "IDOC defendants")(d/e 122) is granted in part as follows:

    A)    Summary judgment is granted to the IDOC defendants on Plaintiff's claims for deliberate indifference regarding the medical treatment he received at Logan Correctional Center in 2003-2004 for his lipoma, ganglion, and hernia.  Defendants Elyea, Huffman, Cooper and Snyder are dismissed, as they are implicated only in these claims.

    B)    Summary judgment is granted to the IDOC defendants on Plaintiff's claims regarding his dental care, on the grounds that Plaintiff failed to exhaust his administrative remedies, or, in the alternative, on the grounds the Plaintiff has waived the claim.  Defendant Thompson is dismissed, as he is implicated only in this claim.

    C)    Summary judgment is granted to the IDOC defendants on Plaintiff's procedural due process claims regarding the January 13, 2005 disciplinary report and subsequent disciplinary proceedings and punishment.

---

[4]Plaintiff does not dispute that he made no complaints about the lockdown at his medical appointments, but that does not necessarily mean the conditions did not occur.

       D)      Defendants' summary judgment motion is otherwise denied.

3) The remaining claims are:

       A)      The January 13, 2005 disciplinary ticket and subsequent disciplinary hearing, punishment and transfer to a different prison was in retaliation for Plaintiff's exercise of his First Amendment rights. At this point, this claim proceeds against the following defendants: Willis, Bensko, Gonzalez, Benton and Firkus.

            1)      By October 5, 2007, Defendants Bensko, Gonzalez, Benton and Firkus are directed to file a summary judgment motion on Plaintiff's retaliation claim.

       B)      The conditions in lock-down during July, 2003, in Logan Correctional Center violated the plaintiff's Eighth Amendment and Fourteenth Amendment rights. This claim proceeds against the following defendants: Firkus, Sims, Schonauer, Niles, Jennings, and Tanner.

       C)      Defendant Firkus' refusal to move Plaintiff from a segregation cell with a broken bed and water leaking onto the floor, when other dry segregation cells with intact beds were unoccupied and readily available, violated Plaintiff's Eighth Amendment rights. This claim proceeds against defendant Firkus only.

4) Plaintiff's motion to compel (d/e 110) is granted in part and denied in part as follows. By October 1, 2007, Defendants shall produce to Plaintiff:

       A)      The names and identification numbers of the inmates housed in unit one of Logan Correctional Center during June and July 2003.

       B)      The Unit One Log Book from Logan Correctional Center from the period of June to July 2003.

       C)      All documents pertaining to Plaintiff's transfer out of Logan Correctional Center.

       D)      All documents pertaining to the investigation of Inmate Warren pertaining to the incident of January 7, 2005, and all written or recorded statements made by Inendino regarding same. If none, Defendants shall so indicate.

       E)      The Plaintiff's motion to compel is otherwise denied for the reasons advanced by Defendants or because the requests are moot.

4)     A final pretrial conference is scheduled for March 17, 2008 at 1:30 p.m. by video conference.

5)     The proposed final pretrial order shall be filed by March 3, 2008.  The proposed order must include (1) the name, prison number, and place of incarceration for each inmate to be called as a witness (to appear by video); 2) the name of each Illinois Department of Corrections employee to be called as a witness and the location from where each will testify, if by video; and 3) the names and addresses of any witnesses who are not inmates or IDOC employees for whom a trial subpoena is sought.  It is the responsibility of the parties to pay the witness and mileage fees to the subpoenaed witnesses and to serve those subpoenas.  Fed. R. Civ. P. 45;

6)     Jury trial is scheduled for March 31, 2008, at 9:00 a.m. by personal appearance before the court in Urbana.

Entered this 7th Day of September, 2007.

**s\Harold A. Baker**

_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

17